UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSHUA A. RICHARDSON | ) | |
|     Plaintiff | ) | |
| | ) | |
|     v. | ) | CIVIL ACTION NO._____ |
| | ) | |
| PETER J. KOUTOUJIAN, BRIAN CRANE, | ) | |
| TELLY T. JACK, STEVEN P. SINATRA, | ) | |
| RYAN E. ABRAMS, SEAN W. GRIFFIN, | ) | |
| MARK FANTASIA, MARTIN R. SABOUNJIAN, | ) | |
| JAMAL S. ABU-HIJLEH, JOSEPH MCLAUGHLIN, | ) | |
| CORRECTIONAL OFFICER DOES 1-3, and | ) | |
| NURSE DOES 1-3 | ) | |
| | ) | |
|     Defendants | ) | |

**COMPLAINT AND REQUEST FOR JURY TRIAL**

**INTRODUCTION**

1.  This is an action for money damages brought by Plaintiff Joshua A. Richardson, a former inmate who suffered severe and permanent injury when correctional staff and the Middlesex County Jail at Billerica maliciously and sadistically assaulted him, shooting him at close range with dangerous kinetic weapon and spraying him in the face and the rectal and genital areas with "OC" or "pepper" spray. Then, as a result of deliberate indifference to his medical needs by correctional officers and nurses, the plaintiff was denied decontamination and adequate medical care, exacerbating his injuries and causing further pain and suffering. He was left with injuries to the head, genito-urinary system, and back and to date continues to suffer great pain of body and mind.

2.  Defendant alleges that Sheriff Peter J. Koutoujian and other correctional supervisors at the jail failed to adequately train, supervise and discipline member of the jail staff.  They created, continued or acquiesced in the practice of violent summary punishment of inmates at the jail with impunity for all involved and promulgated policies and customs that tolerated and fostered constitutional violations.  The defendants were at all pertinent times deliberately indifferent to the likelihood that plaintiff would become the victim of excessive force and medical indifference in violation of his constitutional rights through their own acts and omissions.

3.   In addition to claim arising from the aforesaid misconduct under federal and state law, plaintiff brings claims against defendant Peter J. Koutoujian in his official capacity as sheriff for violation of state and federal public records laws.

## JURISDICTION AND VENUE

4.  The action is brought; under 42 U.S.C. § 1983, for violations of the plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution, claims subject to the jurisdiction of this Court per Title 28 U.S.C. § 1331 and 1343; for denial of access to public records under the Federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, with jurisdiction pursuant to § 552(a)(4)(B); for common law torts, violation of the Massachusetts Civil Rights Act, M.G.L. c. 112 § 11IM, and violation of the Massachusetts Public Records Law, M.G.L. c. 66 § 10, all claims subject to the supplemental or pendant jurisdiction of this Honorable Court under 28 U.S.C. § 1367.

5.  This action is properly brought in the Eastern Division of the United States District for the District of Massachusetts under 28 U.S.C. § 1391 (b)(1) and (2) because the events at issue in this case arose and occurred in the Eastern and on information and belief all parties reside in the Eastern Division of the District of Massachusetts.

## PARTIES

6.  Plaintiff Joshua Richardson resides at 38 Knott Avenue, Sandwich, Barnstable County, Massachusetts and at all pertinent times was a sentenced inmate of the Middlesex Jail and House of Correction in Billerica, Middlesex County, Massachusetts ("the jail") in custody of the Middlesex Sheriff's Office ("MSO").

7.  Defendant, Peter J. Koutoujian, ("Koutoujian") was at all pertinent times the Middlesex County Sheriff employed at the MSO, and he resides at 33 Harris Street, Waltham, Middlesex County, Massachusetts.

8.  Defendant Lt. Brian J. Crane, ("Crane") was at all pertinent times a correctional officer supervisor employed at the jail, and he resides at 9 Hillside Drive, Townsed, Middlesex County, Massachusetts.

9.  Defendant Sean W. Griffin ("Griffin"), was at all pertinent times employed as an Assistant Superintendent at the jail, and he resides at 49 Dyer Street, North Billerica, Middlesex County, Massachusetts.

10.  Joseph F. McLaughlin ("McLaughlin"), was at all pertinent times a correctional supervisor employed at the jail, and he resides at 10 Ferry Road, Unit A, Salisbury, Essex County, Massachusetts.

11.  Defendant Telly T. Jack ("Jack") was at all pertinent times a correctional supervisor employed at the jail, and he resides at 7 Robins Drive, Tyngsboro, Massachusetts.

12.  Defendant Steven P. Sinatra ("Sinatra"), was at all pertinent times a correctional supervisor employed at the jail, and he resides at 32 Indian Road, Groton, Massachusetts.

13.  Defendant Martin R. Sabounjian ("Sabounjian"), was at all pertinent times a correctional supervisor employed at the jail, and he resides at 184 Varnum Rd. Dracut, Middlesex County, Massachusetts.

14.  Jamal S. Abu-Hijleh, is a correctional officer employed by the Middlesex County House of Correction (Billerica) who resides either at 1558 Antietam Drive, Columbus, GA, 31907 (Muscogee County) and/or possibly at 117 Charant Road, Lowell, Middlesex County, Massachusetts.

15.  Correctional Officer Does 1-3 were at all pertinent times correctional officers employed at the jail on November 26, 2015, and upon information and belief they reside in Middlesex County, Massachusetts.

16.  Nurse Does 1-3 were at all pertinent times nurses employed at the jail on November 26, 2015, and upon information and belief, they reside in Middlesex County, Massachusetts.

17.  Claims for violation of state and federal public records laws are brought against Peter J. Koutoujian in his official capacity as Middlesex Sheriff and chief executive of the MSO.

18.  As to all other claims brought against them each defendant, including Koutoujian, is sued in his or her individual capacity

**FACTS**

19.  Each preceding paragraph is incorporated in this section as if fully set forth herein.

20.  The plaintiff was incarcerated at the jail as a sentenced prisoner on August 11, 2015.

21.  As sheriff and the WSO chief executive in charge at the jail, Koutoujian was at all pertinent times responsible for the operation of the facility, its policies, rules and procedures, and for the direction and supervision of its correctional and health care staffs.

22.  At all pertinent times Koutoujian's responsibilities included but were not limited to personnel management, and the adoption and enforcement of policies, rules, and procedures regarding use of force, protective custody of inmates, inmate discipline, segregation of inmates, and inmates' access to medical care.

23.  At all pertinent times each defendant acted under color of law, i.e., pursuant to the statutes, ordinances, regulations, policies, customs, practices, usage and authority of the Commonwealth of Massachusetts and/or its agency the WSO.

24.  At all times pertinent times the plaintiff and other inmates similarly situated were systematically subjected to threats and the use of excessive force by correctional staff that:

   1)  Violated written policies and rules of the jail and statutes and regulations of the

   Commonwealth barring abuse of inmates, particularly those pertaining to the use of
   force;

 2) Violated prevailing standards of correctional care and law enforcement;

 3) Caused unjustifiable injury, pain, suffering and risks to prisoners' health and safety;

 4) Amounted to the unlawful practice of corporeal punishment in violation of inmates'
   substantive and procedural rights to due process and their rights to be free of cruel and
   unusual punishment.

25. At all times pertinent hereto the uses of disproportionate force complained of began with
   the refusal of an inmate, while locked in his cell or other confined area and posing no
   threat of harm, to "cuff up," i.e., submit to handcuffing through a gate in his cell door so he
   could then be moved to another location.

26. Pursuant to policies, practices and procedures adopted, implemented, practiced  and
   maintained by the defendants, guards would (and on information and belief currently
   continue to) summon teams of specially trained and armed teams ("move teams") to
   remove, or extract, a recalcitrant inmate from his cell.

27. Upon information and belief the Billerica Move team doing cell extractions would and still
   does spray the inmate with pepper spray ("OC") and shoots them with a kinetic weapon
   (typically an FN 303 gun) from short distances and in some instances as inmates laid on the
   floor in submission.

28. Upon information and belief some of the Defendants' were members of the MOVE team.

29. Upon information and belief, once an inmate is removed from his cell and cuffed the
   MOVE team still takes the inmate from general population to be strapped or chained to a
   metal bed or chair in an isolated cell, sometimes being allowed to decontaminate from the
   noxious and burning effects of the OC and sometimes not.

30. Upon information and belief, in other instances, inmates were placed in restraints or masks
   that impeded breathing, and in other instances there were inmates who had not been
   permitted to wash off the PC from their faces and bodies.

**Punitive use of OC spray:**

31.  Prior to November 2015, the Sheriff's Office had adopted policies that consistent with
   previous policies approved the use of OC on inmates during cell extractions.

32. OC spray in the mild range induces a stinging or burning sensation in the eyes, lacrimation,
   upper respiratory distress, sore throat, and sinus, burning sensation in the skin.

33. Moderate injuries associated with OC include persistent skin rashes, first degree burns, conjunctivitis, ocular injuries, oropharyngeal edema, persistent respiratory symptoms, and in the severe range, third degree burns, airway obstruction, severe ocular trauma and permanent disabilities and in some instances death.

34. Upon information and belief, notwithstanding Billerica Jail regulations purported to require victims of OC spraying to have an opportunity to wash the spray off themselves, timely washing has been denied to certain inmates.

**Punitive shootings with FN303:**

35. The FN303 "less lethal launcher," ("FN 303" or "weapon") is a kinetic energy weapon manufactured and sold in the United States.

36. The FN 303 fires a .68 caliber fin-stabilized projectile weighing typically 8.5 grams.

37. These guns are semiautomatic and fire 15 rounds without reloading, with a muzzle velocity of 280 to 300 feet per second [equivalent to 191 to 204 miles per hour] and is capable of "incapacitating specific targets" by inflicting "shock and pain.

38. Projectiles of kinetic energy weapons, and in particular the FN303, can and do cause fist sized bruises, penetrating injuries, internal injuries, and fatal injuries - the shorter the distance from which the victim is shot the greater the likelihood of severe or life threatening injury.

39. At all times pertinent to this complaint the supervisory Defendants' knew of the risk of serious injury or death associated with kinetic energy weapons, knew there were no standards for safe use of such weapons because of a lack of data on human tolerance to impacts from blunt force projectiles, and knew of the risks of penetrating and potentially lethal injuries associated with close range use of kinetic energy weapons and in particular with use of the FN 303.

40. Upon information and belief, the Billerica Move team has fired the FN303 repeatedly at each of the defendants during cell extractions, notwithstanding that inmates were confined and unable and not threatening to harm any person, and in the large majority of instances, inmates were struck my projectiles and injured as a result.

**The MOVE Team extracted Richardson from his cell**

41. Upon information and belief, shortly after being incarcerated, Richardson began having a number of problems initially related to a refusal to have TB shot upon his incarceration.

42. Richardson told correctional staff that prior to being incarcerated he had received a TB shot and that he did not want one.

43. Because of his refusal to be immunized from TB, Richardson was placed in segregation or the "hole."  This disciplinary action was undertaken to punish him for refusing to be vaccinated.

44. Shortly after his admission, Richardson, a vegetarian, requested he be placed on a vegetarian diet plan –available at the Billerica Jail.

45. The implementation of the vegetarian diet was delayed and Richardson lost approximately close to 30lbs of weight.

46. Due to his weight loss Richardson requested he be put back on a regular meal plan or  non-vegetarian meals.

47. Richardson was taken off from the vegetarian diet approximately one month prior to Thanksgiving.

48. On November 26, 2015, Thanksgiving day at approximately 10:50 am, Richardson went to the "Day Room" to have his Thanksgiving lunch meal.

49. This is when he encountered Lt. Crane along with CO Jack.

50. Although Richardson was back on a regular diet, Lt. Crane, who was responsible for inmate supervision in the area of Day Room insisted Richardson could only have special "Vegetarian" meal.

51. Richardson informed Lt. Crane he was on regular diet.

52. Although Lt. Crane knew that Richardson was back on regular diet he insisted Richardson could only take a special vegetarian meal for no other reasons than to bust his chops and harass him.

53. Richardson refused to have the vegetarian meal as it was disgusting and took a regular meal that had been prepared and stacked.

54. Lt. Crane became enraged and assaulted Richardson by smacking from his hands the food tray he was carrying.

55. In a disciplinary report, Lt. Crane falsely reported that he gave Richardson several verbal commands to take his (vegetarian) meal, which he also refused.

56. Lt. Crane also falsely reported that …. "[R]ichardson, drew attention to himself by throwing his meal on the floor and disturbing the orderly flow of the line."

57. Lt. Crane grabbed Richardson by his arms and told him "You're fucking out of here" as he signaled for assistance.

6

58.   Lt. Crane was joined by CO Jack who also without justification assaulted Richardson as thy grabbed and escorted Richardson from the cafeteria to the "hole."

59.   Richardson was upset because he had already been locked in the hole for 30 days.

60.   Richardson was locked in a single cell in the hole and was approached by Lt. Crane with a blue uniform.

61.   While in the hole inmates are only allowed to bath only every other day and not on the weekends.   Typically they remained locked in their cell for close to 23 ½ a day, they do not have access to make calls to family members, among other punitive measures.

62.   Lt. Crane insisted that Richardson had to go on to Protective Custody.

63.   Richardson never requested to be placed in protective custody.

64.   Protective custody is an area in the jail that often contains sexual predators, sexual offenders, pedophiles and police informants.

65.   Richardson told Lt. Crane that he would refuse to be move to protective custody and as per the Billerica jail policy requested to speak with a "white shirt" or the Commanding Officer for the shift.

66.   A shift Captain arrived to speak with Richardson. Richardson explained he was not going to protective custody, as he had not been so classified by the classification department and wanted his lunch which he never got.

67.   When Richardson refused the order to wear a blue shirt and move into protective custody, Lt. Crane and possibly other unidentified Defendants' activated the MOVE team.

68.   The MOVE team arrived and when Richardson refused to change his clothing.

69.   Members of the MOVE team opened the trap to his cell and began spraying copious or industrial amounts of OC.

70.   Richardson was affected by the OC spray causing him to gag, to have breathing difficulties, began to experience an intense burning sensation throughout his face, mouth, his eyes, nasal membranes and skin.

71.   While being sprayed correctional officers had to be rotated because they also were overcome by the effects of the OC spray.

72.    Shortly after the Defendants' members of the MOVE team flooded Richardson's cell with copious amounts of OC, they introduced a 6' metal pole or battering ram designed to open the door to a cell with.

73.    Instead of using the 6' pole to open the cell, Defendants used it as weapon of immediate opportunity to assault Richardson in various parts of his body.

74.    The next thing members of the MOVE team did was they began shooting randomly a kinetic weapon, upon information and belief, the FN 303, that contained pepper ball projectiles which they aimed at Richardson.

75.    Richardson was struck numerous times by the pepper ball projectiles causing immediate bruising, hematoma, bleeding and burning as the projectiles broke through his skin.

76.    Richardson was shot in his torso and arms.

77.    The MOVE team eventually entered into Richardson's cell and immediately began to knee him and kneel on his body.  They also began to assault him with closed fists in multiple body parts, including his face, the top and back of the head, kidney.

78.    All of this occurred as Richardson screamed "I am not resisting."

79.    While in the ground and already handcuffed, Richardson's body and back and shoulders were bent into an unnatural position.

80.    Just before Richardson was dragged out of his cell, Lt. Crane ordered officers to cut his shorts while Richardson was already handcuffed in his wrists and legs.

81.    Richardson who was prone on the ground, seriously injured and was naked when Lt. Crane ordered staff to spray him with OC in his private parts, which some Defendants' did causing Richardson an extraordinary amount of pain and suffering.

82.    There was no justification for these actions.

83.    No reasonable officer would have done what they did to Richardson and their actions served no legitimate lawful or penal purpose.

84.    Richardson was then escorted and dragged out of his cell and brought to the "medical watch" area of the hole where inmates are typically placed in suicide watch.

85.    He was brought inside of the cell and placed in turtle suit that are used for suicidal inmates even though Richardson was not suicidal.

86.  Richardson asked to be decontaminated and to be allowed to take a shower and to be given a towel to remove the OC.  This is standard policy and procedure in any jail and at Billerica.

87.  But instead Richardson was told he would get a shower on Monday, four days after Thanksgiving.

88.  When Richardson was placed in the Medical watch cell as tried to activate the faucet to wash off the OC spray Richardson realized there was no running water in his cell.

89.  When Richardson asked the shift officer about the lack of running water he was told it had been shut off.

90.  Richardson's cell water was intentionally turned off in order to: a) prevent him from washing the effects of the OC and, b) to demean him, c) and to punish him by maximizing his pain during the weekend.

91.  Richardson asked for medical care and that's when he came in contact with Nurse Doe RN., who only saw him once.

92.  Richardson asked her to clean him off because his entire body was burning from the OC effects.  Doe RN told him she could not clean him with water because it could "reactivate the pepper spray."

93.  Although Richardson had gashes and cuts on his face and head that required, at a minimum, emergency medical care and suturing, Defendant Doe RN did not transfer him for emergency care.

94.  Nurse Does 1-3, negligently, grossly negligently, recklessly, wantonly and/or intentionally with deliberate indifference grossly deviated from the acceptable standards of care in the medical management and treatment of Mr. Richardson's injuries and medical condition.

95.  The refusal to provide emergency medical care evinced deliberate medical indifference to Richardson's serious medical needs.

96.  The only "medical care" provided to Richardson consisted of pat whipping his wounds.

97.  Richardson asked the nurse to photograph his wounds but no one obtained pictures of Richardson's wounds as required by policies and procedures.

98.  During the four day period were Richardson was not allowed to wash, decontaminate his wounds or received medication he experienced a great deal of pain, suffering and mental distress.

99.  From time to time, staff would flush his waterless toilet.

100. Richardson was charged with a disciplinary offense and spoke with a disciplinary supervisor whose nickname is "Moose."

101. "Moose" told Richardson he would be punished with 30 days in the hole and that he didn't know why anyone wanted to bring him into protective custody.

102. Richardson later learned from correctional staff that the tape of his MOVE team cell extraction was circulated around the jail and it was viewed as if it was comedic.

103. Upon information and belief, while in the "hole" Richardson filed or attempted to file numerous grievances. He never once heard from any of his grievances.

104. The grievance process is the only manner in which prisoners' concerns can be addressed.

105. Shortly after his beating Richardson began to experience urinary problems which manifested themselves without limitation as an inability to control or to empty his bladder, urine incontinence.

106. Upon information and belief Richardson placed medical sick slips regarding his urinary difficulties and on one occasion a physician apparently ordered an ultrasound.

107. At all times pertinent hereto the jail maintained a written policy, or a sick-call policy adopted and approved by the medical department for assuring that inmates had access to health care.

108. Those policies provided that access to daily sick call is an inmate's right, not a privilege and it guaranteed inmates "the opportunity to report a medical illness or other health problem, and to receive diagnosis and/or treatment, from medical staff.

109. The aforesaid policy required that sick call be conducted on a daily basis "by qualified healthcare professionals who shall provide appropriate response to healthcare request by inmates" who were "responsible for examining the inmate and providing appropriate triage and treatment based on approved protocols or refer the inmate to the facility physician."

110. The aforesaid policy required that inmates who submitted written medical services requests must have access to daily sick call.

111. The aforesaid policy required staff of the jail medical department to collect and review medical services request forms daily from each inmate housing unit of the jail and to have ill inmates brought to the medical department for assessment.

112. At all times pertinent hereto the jail maintained a written policy, adopted and approved by the jail stating that it was the policy of the jail "to provide unimpeded access to health care for all inmates.

113.  The aforesaid policy stated that, besides gaining access to daily sick call by submitting a written medical services request, an inmate may request assistance from any staff member for access to medical services.

114.  The aforesaid policy required that inmates' health complaints shall be processed on a daily basis by the Health Service Unit.

115.  The aforesaid policy required that in the event a health care complaint is other than routine in nature, medical staff shall contact the on-call physician who could order hospitalization if necessary.

116.  As a direct and proximate result of the actions or omissions from the defendants' Richardson was harmed.

117.  As a direct result of the beating and the unreasonable use of force Richardson suffered a number of injuries including scarring on his head, scarring on his genitalia that appears like road rash from being sprayed in his genitals, urinary incontinence, urinary irritative voiding symptoms, leaking of urine when he bends or coughs, injuries to his lower back, and he also experienced a great deal of pain and mental suffering.

Public Records Claim

118.  On April 13, 2018 Plaintiff's counsel wrote a certified letter to Peter J. Koutoujian, Middlesex County Sherriff.

119.  **Ex. 1** is a fair and accurate copy of the letter written to Sheriff Koutoujian.

120.  The letter was carbon copied to Attorney Lee Gartenberger, Director of Inmate Legal Services.  In addition, the Sheriff's Office, signed for the return of service.

121.  The letter requested an amalgam of records regarding Plaintiff Joshua A. Richardson. The letter contained forty-five different requests including but not limited to any surveillance video that captured the cell extraction and placement into the medicalwatch department, medical records, etc.

122.  The Sheriff has not complied with the public records requests, in fact, has completely ignored it.

123.  Accordingly, Plaintiff asserts a pendent claim to enforce the Public Records law, G.L. c. 66 § 10 and for declaratory judgment, preliminary injunction and award of punitive damages and reasonable attorneys' fees and cost for the refusal to comply with the public records law.  The letter was also sent under the Federal Freedom of Information Act (FOIA), 5 U.S.C. § 552.

## COUNT I
### PETER J. KOUTOUJIAN
### VIOLATION OF THE MASSACHUSETTS PUBLIC RECORDS LAW
### M.G.L. c. 66 § 10

124. Plaintiff realleges and incorporates by reference the allegations above.

125. Under the Public Records Law, M.G.L. c. 66, § 10, public entities of the Commonwealth and its political subdivisions must "at reasonable times and without unreasonable delay permit inspection or furnish a copy of any public record."

126. This Honorable Court has authority to order a keeper of public records to comply with the statutes.  M.G.L  c. 66 § 10(b).

127. Sheriff Koutoujian and the Billerica County House of Corrections are subject to the Public Records law.

128.  The Plaintiff made a request for public records from Sheriff  Koutoujian on April 13, 2018.

129. No exemption to the Public Records Law permitted or allowed Sheriff Koutoujian to refuse to provide access and copies of the requested records.

130. The Sheriff's failure to provide these records violates the Massachusetts Public Records Law.

## COUNT II
### PETER J. KOUTOUJIAN
### VIOLATION OF THE FREEDOM OF INFORMATION ACT
### 5 U.S.C. § 552

131. Each of the preceding paragraphs in incorporated in this count as if fully set for herein.

132. This Honorable Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

133. As the chief executive of the MSO, and agency that receives federal funds, defendant Koutoujian is subject to the Freedom of Information Act.

134. Defendant Koutoujian failed to respond to the plaintiff's records requests within the statutorily mandated time or at any time to date, failed to provide contact information for the MSO FOIA public liaison, and failed to produce any of the records sought in the request with no legal basis, all in violation of 5 U.S.C. §§ 552(a)(3) & (6).

## COUNT III
### NURSE DOES
### NEGLIGENCE/MEDICAL MALPRACTICE

135. Each of the preceding paragraphs in incorporated in this count as if fully set for herein.

136. At all times pertinent hereto, Nurse Does 1-3 each represented themselves to be skilled in the provision of nursing care and treatment and knowledgeable, competent and qualified to provide nursing and medical care for conditions commonly found among inmate populations, including the plaintiff.

137. Beginning on November 26, 2015 Defendants Nurse Does 1-3 provided and/or failed to provide nursing and medical care to the plaintiff, their patient, so negligently, carelessly, grossly negligently and without regard for plaintiff's health and well-being so as to proximately cause and/or to aggravate his suffering and injury.

138. The plaintiff's suffering and permanent injury are the direct and proximate results of the carelessness, unskillfulness, negligence, and gross negligence of Nurse Does 1-3 in one or more of the following respects:

- The misrepresentations of each of these defendants as to her being sufficiently knowledgeable, skillful, and diligent to treat the plaintiff and others similarly situated;

- The failure of each to and appropriately observe and provide appropriate care for Richardson's medical condition;

- The failure of each to recognize, or to have knowledge to recognize, her inability and lack of skill to treat Mr. Richardson's when each knew or should have known of the foreseeable consequences of her inability and failure to properly and skillfully provide Mr. Richardson with appropriate nursing and medical care and treatment;

- Their failure to possess and exercise the degree of skill, training and care as is or should be possessed and exercised by the average qualified member of the medical profession;

- The failure of each to provide adequate nursing and medical treatment, including appropriate treatment of Richardson's injuries, condition and pain.

## COUNT IV

### JACK, SINATRA, FANTASIA, SABOUNJIAN, ABU-HIJLEH, ABRAMS CRANE AND CORRECTIONAL OFFICER DOES 1-3
### EXCESSIVE FORCE, CRUEL & UNUSUAL PUNISHMENT 42 U.S.C. § 1983

139.  Each of the preceding paragraphs in incorporated in this count as if fully set for herein.

140.  When Defendants shot Richardson when they sprayed him with pepper spray they acted maliciously, sadistically and with reckless disregard to his health and well-being.

141.  As a direct and proximate result of Defendants' violations of his constitutional rights to due process and to be free of and excessive force cruel and unusual punishment, Richardson was beaten and injured, as set forth herein.

142.  At all times these defendants knew of the risk that shooting a prisoner at close range with high powered kinetic weapons would cause extreme pain and suffering and serious injury.

143.  At all times Defendants knew that pepper spraying an inmate without the benefit of decontamination would amount to malicious, sadistic and reckless disregard to the health and well-being of Richardson.

144.  At all times Defendants knew that pepper spraying an inmate in the anal or pubic areas would amount to malicious, sadistic and reckless disregard for his health and well-being.

145.  The weapons employed to inflict pain and injury as retribution for Richardson's refusal to cuff up, including but not limited to spraying him with OC, shooting him with kinetic weapons, and striking him with closed fists, was unreasonable in circumstances where plaintiff was not assaultive, and posed no reasonably perceivable risk of harm to any person.

146.  As a direct and proximate result of the foregoing, Richardson was injured and harmed as set forth herein.

### COUNT V
### NURSE DOES 1-3
### MEDICAL INDIFFERENCE 42 U.S.C. § 1983

147.   Each of the preceding paragraphs in incorporated in this count as if fully set for herein.

148.  At all pertinent times these defendants were aware of and deliberately and consciously indifferent to a clear and imminent danger Richardson would be subject to harm, injury, and/or unnecessary pain and suffering, arising from the failure to monitor, evaluate, diagnose and treat his serious medical condition in a timely fashion as set forth herein.

149.  The risk of harm, defendants' knowledge thereof, and their failure to take available and

obvious steps to avert or minimize harm and suffering placed Richardson in harm's way, and demonstrated that defendants were reckless, callous and deliberately indifferent to the harm that occurred.

150. These defendants subjected the plaintiff to these deprivations knowingly, intentionally, willfully, purposely, maliciously and/or with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

151. As a direct and proximate result of the foregoing plaintiff was deprived of his rights under the laws and Constitution of the United States, in particular the Eighth and Fourteenth Amendments thereof and 42 U.S.C. § 1983, 1985(2)(3), 1985 and 1988, and under the law of the Commonwealth, and thereby he sustained devastating injury and great pain of body and mind.

## COUNT VI
### CRANE, MCLAUGHLIN, GRIFFIN
### DELIBERATE INDIFFERENCE/FAILURE TO INTERVENE/PROTECT AND FAILURE TO SUPERVISE 42 U.S.C. § 1983

152. Each of the preceding paragraphs in incorporated in this count as if fully set for herein.

153. As a direct and proximate result of these defendants' actions and omissions, their failure to adequately direct, supervise, train, and discipline correctional officers or to intervene or impose discipline on officers who engaged in violation of inmates' constitutional rights, plaintiff's constitutional rights to due process and to be free of unreasonable search and seizure, and excessive force, Richardson was beaten, denied medical care, treated with deliberate indifference and injured and subjected to great pain and suffering as set forth herein

154. The risk or harm, defendants' knowledge thereof and the failure to do the obvious, taken together, placed Richardson in harm's way, and demonstrated that defendants' were reckless, callous and deliberately indifferent to the harm that has occurred.

155. By their actions, the said defendants subjected the plaintiff to these deprivations knowingly, intentionally, willfully, purposely, maliciously and/or with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

156. As a direct and proximate result of the foregoing plaintiff was deprived of his rights under the laws and Constitution of the United States, in particular the Eighth and Fourteenth Amendments thereof ant 42 U.S.C. § 1983, 1985(2)(3), 1985 and 1988, and under the law of the Commonwealth, and thereby endured devastating injury and great pain of body and mind.

## COUNT VII
### CONSPIRACY
### LT. CRANE, JACK, SINATRA, FANTASIA, SABOUNJIAN, ABU-HIJLEH, ABRAMS CRANE AND CORRECTIONAL OFFICER DOES DOES 1-3

157. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

158. These Defendants did conspire to conceal Mr. Richardson's beating and mistreatment by preparing and submitting false police reports among other actions.

## COUNT VIII
### ASSAULT AND BATTERY

### CRANE, JACK, SINATRA, FANTASIA, SABOUNJIAN, ABU-HIJLEH, ABRAMS CRANE AND CORRECTIONAL OFFICER DOES DOES 1-3

159. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

160.  Defendants' committed the common law torts of assault and battery against the plaintiff.

161. As a direct and proximate result thereof, the plaintiff suffered the injuries described above.

## COUNT IX
### MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 112 § 11IM

### CRANE, JACK, SINATRA, FANTASIA, SABOUNJIAN, ABU-HIJLEH, ABRAMS CRANE AND CORRECTIONAL OFFICER DOES DOES 1-3

162. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

163. These Defendants' deprived the plaintiff of his rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

164. As a direct and proximate result of the aforesaid unlawful conduct, the plaintiff suffered the injuries described herein.

**COUNT X**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
LT. CRANE, JACK, SINATRA, FANTASIA, SABOUNJIAN, ABU-HIJLEH, ABRAMS,
CRANE, CORRECTIONAL OFFICER DOES 1-3
AND NURSE DOES 1-3

165.  Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

166.  The conduct of the Defendants' named in this count constituted intentional infliction of emotional distress.

167.  By their actions, defendants subjected Richardson to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

168.  As a direct result of the intentional conduct of the defendants in this count, Richardson suffered severe emotional distress and great pain of body and mind.

### DEMANDS FOR RELIEF

The Plaintiff hereby respectfully requests the following relief:
1.   All compensatory damages recoverable;
2.   Injunctive relief;
3.   All punitive damages recoverable ;
4.   All attorney's fees, costs and expenses allowable;
5.   Any and all other relief as the Court deems just and proper;
6.   That defendants be found joint and severally liable

### PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT

Respectfully submitted,
Plaintiff JOSHUA A. RICHARDSON
By his attorneys,

*/s/ Héctor E. Piñeiro*

_____
Héctor E. Piñeiro BBO#555315
Robert A. Scott, BBO # 632447
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

DATED:  November 21, 2018